JULIA G. BROOKS, ANNA M. DE MOTTE and MARY E. JUSTIN, executrices of the last will of Gertrude A. Van Horne, deceased,

*v.*

HENRY KIP and WILLIAM W. SCOTT, executors of the will of John I. Ackerman, deceased, et al.

A, by his will, devised certain of his lands to his son B, and certain other of his lands to his son C, and charged his sons, respectively, with the payment of moneys to his wife and daughters. The will contained this provision: "If they [referring to the sons] should die, or either of them, without child or children, * * * the real estate given to them or either of them shall go to my other children, share and share alike."—*Held,* (1) that the sons each took a conditional fee in his holding, with a limitation over to the testator's "other children" by way of executory devise; (2) that among the "other children" of the testator intended was included one of the sons who died leaving a child; (3) that the children of the testator who survived him took contingent interests in severalty, which were transmissible by descent and devisable by will.

Brooks *v.* Kip.

On bill, answer, replication and proofs.

The following facts are established by admissions and undisputed proofs:

John A. Ackerman, of the township of Acquackanonck, in Passaic county, in September, 1839, for the consideration of $3,800, purchased from Marcelis Parks twenty-five acres of land, now in the city of Jersey City, which Parks, two months before then, had bought at public sale for $3,350, and in April, 1841, he, Ackerman, conveyed the same to his son, Albert Ackerman, by deed, which purported to be made in consideration of $1,400, the payment whereof the father acknowledged, subject to a mortgage for $1,675, which mortgage appears to have been paid and satisfied in the year 1848.

In July, 1850, John A. Ackerman died testate, leaving him surviving his widow, Matilda, and four children—two sons, Albert, born September 21st, 1814, and John I., born March 17th, 1823; and two daughters, Gertrude, married to one Van Horne, and Catharine Maria, married to one Kip. His will, bearing date on the 22d day of August, 1849, after ordering the payment of his debts and funeral expenses, is in this language:

"*Item 2nd.* It is my will and I do give unto my son John the house and out-houses where I now live together with fifteen acres of ground bounded on the West by lands of Jacob Jno. Vreeland on the east so as to take in the dock South by the Passaic River and thence to run so far north as to make the fifteen acres. Also two acres of Cedar swamp and the whole of my woodland lying in Hudson County containing about seventeen acres together with my horses, cows, oxen and farming utensils except one horse and cow which are to be kept on my farm for the use of my wife during her widowhood. I also give unto my son John my notes, bonds, obligations and money if any after my debts are paid and it is my further will that my son John pay my daughter Ann wife of Albert Ackerman, the sum of six hundred Dollars in two equal payments one-half in one year after my decease and the balance in two years after my decease without interest.

"*Item 3d.* It is my will and I do give unto my son Albert my salt meadow at Newark containing about seven acres and I do order that my son Albert pay my daughter Ann, wife of Albert Ackerman, Six hundred dollars, three hundred dollars in one year after my decease and the balance in two years after my decease without interest.

"*Item 4th.* It is my will and I do give unto my sons John and Albert all the rest, residue and remainder of my real estate whatsoever and wheresoever not before bequeathed to be divided between them share and share alike and it is my further will and I do order that they pay my two daughters Gertrude, wife of Van Horn, and Catharine Maria, wife of Kip, each fifty dollars one year after my decease.

"*Item 5th.* It is my will and I do give unto my wife Matilda one hundred and twenty dollars per year during her *widahood* in lieu of her dower and I bind my two sons John and Albert to pay her the said sum of one hundred and twenty dollars yearly and every year as long as she remains my widow if she *exceps* the same in lieu of her dower also her choice of one room on the first floor in my house and two *bead* rooms in the garret together with my furniture such as *beadstids, beads, beading,* chairs, table, looking-glasses &c., also the use of the kitchen for washing, baking, &c. as she may need it during her *widahood* also the use of one horse and one cow to be kept on the farm as above mentioned.

"*Item 6th.* It is my will and I do order that the real estate given to John and Albert if they should die or either of them leaving no child or children as lawful heirs, then the said real estate so before bequeathed to them or either of them (or the value thereof) shall *decend* to my other children share and share alike, that is to say it is not my intention by this item that my said sons John and Albert or either of them shall not have the privilege and right to sell the real estate or any part thereof at a fair valuation if they or either of them wish so to do but it is my will that the money arising from such sale or sales (exclusive of the Int) shall be by them or either of them put on bond and mortgage or real estate purchased therewith or safely invested so that if they or either of them should die without lawful heir as above mentioned then the same to *decend* to my other children share and share alike.

"*Item 7th.* And lastly I do hereby appoint my said sons John and Albert executors of this my testament and last will hereby revoking all former wills by me made and executed."

The testator's daughter, Ann Ackerman, died after the will was made and before the 4th of May, 1850, at which date the testator made a codicil to his will which provided that his son John should pay the $600, which the will directed him to pay to his sister Ann, "to," using the language of the codicil,

"my other two daughters, viz., Gertrude, wife of Van Horne, and Catharine Maria, wife of Kip, share and share alike and in the same manner that he was to pay to Ann,"

and that the testator's son Albert should pay the $600 which, by the will, he was directed to pay to Ann, "to," resuming the language of the codicil,

"my other two daughters, viz., Gertrude and Catharine Maria as aforesaid, in manner as directed in my will; and I make and publish this my codicil as explanatory of the legacy in my last will directed to be given to my daughter Ann now deceased, which is now, by my codicil, made void, and the same to be given to my other two daughters as is hereinbefore directed."

The testator's wife received that which the will gave to her, and the sons, John and Albert, paid her the $120 annuity till she died. Albert duly paid each of his sisters, Gertrude and Catharine, $625 and John paid them each a similar amount.

In 1852, Albert and John, by deed, partitioned between themselves the residuary real estate devised to them by the fourth paragraph of their father's will. That real estate consisted of about one hundred and seventy acres of land.

Albert died testate, in March, 1876, leaving him surviving his widow, Helen, and one child, Jane, the wife of John R. Vreeland. By his will he bequeathed and devised his residuary estate, which would include any devisable interest he might have in the property of his brother John I., to his widow, who, in July, 1884, while yet a widow, died intestate, leaving Jane Vreeland, her only child, surviving. Jane Vreeland survived her husband, and died in 1895, leaving an only child, the defendant Albert J. Vreeland.

Gertrude Van Horne died on the 12th of September, 1887, testate, leaving her surviving two sons, Cornelius and Garret, and three daughters (the complainants herein), Anna, married to one De Motte; Mary, married to one Justin, and Julia, married to one Brooks. By her will she bequeathed and devised her entire estate to her three daughters, and made them the executrices of the will.

John I. died on the 1st of September, 1892, without issue. Previous to his death he sold all his real estate, realizing therefor upwards of $20,000, which he mingled with moneys he had from other sources, and did not distinctly invest as the sixth paragraph of the will contemplated he should do. At his death he was seized and possessed of a house and lot in Jersey City, and three houses and lots in Passaic, and real estate known as the "Acquackanonck lot" and "Dock lot," and also was possessed

of personal estate valued at between five and six thousand dollars, in the acquirement of which properties he used portions of the proceeds of the sale of the real estate devised to him by his father. He left a will by which he bequeathed all his personal estate to his wife, Clara, and devised to her, for her life, part of his land. He devised to the heirs of his sisters Gertrude and Catharine, in equal shares, the residue of his estate. His entire estate is worth less than the amount he realized from the sale of the real estate which was devised to him by his father's will. His widow survives him.

Catharine Kip died in August, 1895, after the commencement of this suit. She left a will by which she bequeathed and devised her entire estate to Euphemia Kip, whom she also made executrix of her will. The suit has been revived against Euphemia Kip, as a defendant, in the place of Catharine Kip, deceased.

The object of the bill is to have it decreed that Albert J. Vreeland has no title or interest in the proceeds of the sale of the lands which John Ackerman had from his father, in virtue of the sixth paragraph of the will of John A. Ackerman, and to secure for the complainants and Euphemia Kip the amount of the proceeds of such sale.

The complainants claim that the entire estate should go to them as devisees of their mother, and to Euphemia Kip as the devisee of their aunt, Catharine Kip, and that neither their brothers nor their cousin, Albert J. Vreeland, are entitled to any part thereof. By some arrangement between the complainants and Euphemia Kip and the executors of the will of John I. Ackerman, the widow of John I. Ackerman is to have, for her life, the provision made for her by her husband's will, and the complainants and Euphemia Kip will take the residue of his estate. If they are successful in their contention that Albert J. Vreeland and their brothers are without interest as stated, their arrangement will terminate further litigation.

The only answer in the case has been filed by Albert J. Vreeland, who claims that he is entitled to an equal third of the recovery to be had from the estate of John I. Ackerman, and, by way of cross-bill, asks for the same relief against the estate of John I. Ackerman which the complainants pray for.

Brooks *v.* Kip.

*Mr. Charles H. Hartshorne*, for the complainants.

*Mr. William Brinkerhoff*, for Albert J. Vreeland.

THE CHANCELLOR.

The principal question to be determined at this time is whether Albert J. Vreeland has any interest in the proceeds of the sale of the lands which John I. Ackerman took by his father's will.

The quantity or duration of the estate which John I. Ackerman took in the realty devised to him by the second and fourth paragraphs of his father's will, is not expressly defined in those paragraphs. At the common law, such a devise, standing by itself, would give only a life estate. By force of our statute of 1784 (*Rev. p. 300 § 13*), the devise, standing by itself—that is, as stated in paragraphs 2 and 4, in absence of paragraph 6—would give a fee, but as the sixth paragraph makes further devise of the property at the death of John, the case is not within the statute. Yet it appears that both the second, fourth and fifth paragraphs impose a charge upon John personally. By the second paragraph he is required to pay his sister Ann $600, the receipt of which payment is transferred by the codicil to the sisters Gertrude and Catharine; by the fourth paragraph he and his brother Albert are required to pay Gertrude and Catharine each $50, and by the fifth paragraph he is charged with the payment of an annuity to his father's widow. It is a well-settled rule of construction "that," using the language of Mr. Justice Depue in *Groves* v. *Cox, 11 Vr. 40, 43*, "a devise indeterminate in its terms and without words of limitation, which, standing alone, would create only an estate for life, will be enlarged to a fee by the imposition of a charge upon the person of the devisee or on the *quantum* of the interest devised to him, but not if the premises are merely devised subject to the charge." *Hawk. Wills 134*. The charges imposed upon John as stated, I think, bring the devise to him within this rule.

Thus, when we come to the sixth paragraph of the will, to consider the effect of the devise over there provided for, John is, by implication, clothed with a fee-simple absolute in the lands

devised to him. But this implication is overcome, in .the sixth paragraph, by the provision that if John should die without leaving a child or children who might lawfully inherit from him—"leaving no child or children as lawful heirs"—then the real estate was to "descend," meaning, in the connection in which it is used, "go to" (*Ballentine* v. *Wood, 15 Stew. Eq. 558; Den* v. *Blackwell, 3 Gr. 389*) his other children.

The devise over is not upon the death of John without *issue*, but upon his death without "*leaving * * * child or children.*" The import of this expression is not failure of issue at some indefinite future period, but dying without children at the death of John, a definite event. *Fairchild* v. *Crane, 2 Beas. 105, 107; Brokaw* v. *Peterson, 2 McCart. 194; 2 Jarm. Wills (R. & T. ed.) 146, 762; 2 Washb. Real Prop. (5th ed.) 763, note 4; Kent Com. 278.* The effect of the provision upon the estate of John is that it was thereby made a fee-simple conditional, with a limitation over by way of executory devise to the testator's "other children." *Den* v. *Allaire, Spenc. 6; Groves* v. *Cox, supra; Wilson* v. *Wilson, 1 Dick. Ch. Rep. 321.*

It is immaterial to here consider whether the term "*my other children*" referred to those who answered that description at the time of making the will, or to those who answered it when the testator died, for the will was republished by the codicil after the death of Ann and is to be considered as then made, and no child of the testator died after this second publication of the will and before the death of the testator. The term "my other children" does not refer, as "my surviving children" would, to the time of the happening of the contingency, but, at the furthest, to those living at the death of the testator (*Den* v. *Manners, Spenc. 142; Seddel* v. *Wills, Spenc. 223; Winslow* v. *Goodwin, 7 Metc. 363*), who, by force of the succeeding words "share and share alike," or even without them, took in severalty (*Ballantine* v. *Wood, supra; Winslow* v. *Goodwin, supra; Emerson* v. *Cutler, 14 Pick. 108*) contingent interests which were transmissible by descent and devisable by will. *1 Redf. Wills 391; Winslow* v. *Goodwin, supra; Thornton* v. *Roberts, 3 Stew. Eq. 473, 476,* and cases cited; *cases in reporter's note, 6 Stew. Eq. 51.*

Brooks *v.* Kip.

The question which was really mooted at the argument is whether, within the term "my other children," the testator intended to include the survivor of the two brothers, Albert and John.

The complainants contend that it was not intended to include either brother. They insist that the conveyance in 1841 of the Parks property by John A. Ackerman to his son Albert was in reality an advancement which was equalized to John I. Ackerman by the devise of the homestead, and that it was the purpose of the testator that his sons, who might perpetuate the family name, should have all his estate in equal shares and, after the fashion among the Dutch farmers in those days, that his daughters should be put off with a small gift of money; but that in default of either son leaving issue at his death to perpetuate the name, the share of that son should go to the daughters. They argue—*first*, that it must be presumed that the testator wished to deal equally with his children and that it will best subserve equality, in view of the provision for Albert and the small portions of the daughters, to construe the words "my other children," as used in the sixth paragraph, to mean his daughters; *second*, that the natural and grammatical reference of the words "other children," in the connection in which they are used, is to the testator's daughters; and *third*, any other construction than that insisted upon would be inconsistent with the language used, that the "other children" are to "share and share alike," for his obvious intent is that his son is to take only a conditional fee, which is not the absolute fee that his sisters are to have.

*First.* I cannot assent to the proposition that it is apparent that the testator intended to deal equally with his children. It is clearly demonstrated, by a mere cursory examination of the will, that the sons were preferred and that, as between them, so far as the will goes, John received the larger bounty, and as between the daughters, that if Ann had lived she would have had a greater share than either of her sisters.

It is not established that the conveyance of the Parks land to Albert was an advancement from his father. The proof on that subject comes from one of testator's daughters who, when she

testified, was aged and in feeble health and spoke of matters which occurred when she was a mere child, when it is evident that she may not have correctly understood their meaning, and may have confused mere paternal assistance in a purchase by the son with gift by way of advancement. Her testimony stands in opposition to a deed made for substantial consideration, in which the testator acknowledges that he received such consideration from his son. It was not the $3,800 consideration for which the testator received a conveyance from Parks, but $3,075, $1,400 of which is admitted by the deed to have been paid when the deed was executed, and $1,675 of which appears to have been represented by a mortgage, then an encumbrance upon the property, which was satisfied in some undisclosed way seven years later. Pinned to the deed is a promissory note for $250 to Parks, the name of the maker being torn off, dated on the very day of the date of the deed to Albert, upon the back of which are endorsements indicating that Albert paid the note. The note is evidently in the handwriting of the scrivener who prepared the deed and bears the marks of being as old an instrument as the deed itself. Coming as it does, attached to the deed, with evidences of equal age with that instrument, even though it comes without proof or explanation, it has enough evidential weight to satisfy me that it is at least uncertain that the conveyance of the Parks land to Albert was by way of advancement.

The conclusion, I think, follows that it cannot be assumed that even the sons were equally dealt with.

I think, therefore, that no tenable position can be predicated upon a purpose of the testator to treat his children equally in the disposition of his estate.

*Second.* The sixth paragraph of the will treats of the real estate previously given to John and Albert. They did not take it jointly. Each was entitled alone to that which was specifically devised to him, and in the undivided property mentioned in paragraph 4, to his share as a tenant in common and not as a joint tenant. As has been seen, but for the sixth paragraph, the quantity of estate of each would be a fee-simple. In the sixth paragraph the testator imposed a condition upon the fee

of each son in his respective holding.   Each son must leave law-
ful issue at his death or he should not take any of the testator's
real estate, or at least any part of that which, in the paragraphs
of the will preceding the sixth, was devised to him.   To express
his purpose in this respect the testator used a single sentence,
clearly intended by him to be applicable to the happening of
either of these two contingencies: (*a*) the death of both sons
without leaving issue; (*b*) the death of one son without leaving
lawful issue.   He says: " If they should die or either of them "
without " child or children,   *   *   *   the real estate " given
" to them or either of them " shall go to " my other children
share and share alike."   The words " they " and " them " do
not refer to a joint holding of property but to two deaths, and
hence illustrations used by counsel in the argument, having
reference to a gift to two persons or either of them, are mislead-
ing.   Now, in a separate application of the sentence quoted to the
two contingencies, we have, in the first place, where the contin-
gency contemplated is the death of both the sons without issue,
this reading: " If they should die without child or children, the
real estate given to each of them shall go to my other children ; "
and in the second place, where the contemplation is the death of
one, this reading: " If either of them should die without child
or children, the real estate given to him shall go to my other
children."   The definition of the word " other," as it is used in
the sixth paragraph, is, " different from that which has been
specified."   It is obvious that in the sentence having the double
application referred to, the word " other " is intended to have a
double reference.   When the sentence is applied to the death of
both sons, the word " other," excluding those sons, because they
are the children specified, refers to the daughters only ; but when
it is applied to only one son, then the word " other " refers to
all children except that one son.   I conceive this to be the
natural or true, though perhaps not grammatical, meaning of
the sentence.   The will clearly does not pretend to be a gram-
matically-correct instrument.

*Third.*   If we interpret the language of the sentence considered
literally, neither son can take any portion of the testator's real

estate, either directly from the testator or through a deceased
brother, free from the condition imposed, for the provision is that
if they both die without children the real estate is to go over.
Hence, in giving the effect to the devise over when one dies,
which will include the surviving son among the "other chil-
dren" who are to share the property of the one dying, the con-
dition must attach to that which he will take from his brother's
holding.   This situation gives rise to the criticism that he cannot
"share and share alike" with his sisters, and hence a construc-
tion that he will take at all will not admit of harmony between
all parts of the sixth paragraph.   I apprehend, however, that
the complete answer to this suggestion is that the expression
"share and share alike," following the words "other children,"
has reference to the quantity of property that each child is to
take, and not to the estate each shall have in the share taken.
Because I entertain this view of the meaning of the expression
"share and share alike," and because Albert left a child at his
death, I deem it unnecessary to determine whether Albert would
take in a share of John's property an absolute or conditional
fee.   If he took either, the fee taken at his death, at least, was
absolute.

I am influenced to my conclusion, upon the main question
mooted, by another consideration.   It is this: When his daugh-
ter Ann died, the testator deemed it proper to dispose of the
$1,200 which he had charged his sons to pay her.   To do this
he made a codicil to his will, which republishes the will and
becomes a part of it.   In this codicil he does not direct his sons
to pay the money to "my other children," but specifically directs
each of them to pay $600 to "my other daughters, viz., Ger-
trude, wife of Van Horne, and Catharine Maria, wife of Kip,
share and share alike" &c.   Here is observed a remarkable
similarity to the language of the will.   The expression "my
other daughters" is used in the codicil.   The expression "my
other children" is used in the will.   In the codicil the money,
like the real estate in the will, is to go "share and share alike."
If he had intended that his real estate should, by the devise
over, go to his daughters only, it thus clearly appears that he

could have said so, not only by reference to "daughters" generally, but by the specific mention of their names; but if he meant that a surviving son should share 'in the real estate with the daughters, being without knowledge as to which son would survive, a more difficult task was presented. He was not able to describe the prospective takers by sex, nor could he name the individuals who were to take, for he could not tell which son would survive. He could, of course, explain his purpose by lengthy expression, but would not the general expression " my other children" suffice to manifest his purpose?

My conclusion is that a surviving son was intended to be included in the expression " my other children," and that Albert J. Vreeland is entitled to one-third of the proceeds of the sale of the lands which John I. Ackerman took by his father's will.